IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 21-cv-01966-RBJ

SUZANNE C. LEE, individually, and in her capacity as trustee as an irrevocable trust for benefit of trustee TARAROSE LEE, also known as TARAROSE LEE 2009 IRREVOCALE TRUST, and TARAROSE LEE,

    Plaintiffs,

v.

RICHARD HURD,

    Defendant.

**FINDINGS, CONCLUSIONS and ORDER OF JUDGMENT**

    Suzanne C. Lee and Richard Hurd married in 1998. Initially they lived in New Mexico, but in 2001 they moved to a small ranch located at 145 Highway 15666 Railroad Avenue, Dolores, Colorado (the "Ranch"). Mr. Hurd's father, Charles Hurd, purchased the ranch, ostensibly as a home for Richard and Suzanne, but he titled the property in his own name. Charles promised that the Ranch would be Richard's someday.

    Richard Hurd was an outdoorsman who loved hunting and fishing, and he set up a taxidermy shop near the main home on the ranch. In addition, the couple set upon a project of bringing Tennessee Walking Horses to Colorado for the first time. This is a breed that is uniquely suited for people who wish to ride a gentle walking horse but are not interested in

1

racing, roping, or other more vigorous types of horsemanship. They purchased three horses from a gentleman in Tennessee who also lent them a stud horse to begin a breeding operation.

Unfortunately, problems developed in the marriage, resulting in part from Charles' refusal to place the ranch in Richard's and Suzanne's names. The couple divorced in May 2002. Suzanne returned to New Mexico, where she owned property, and she obtained employment as a teacher. But shortly thereafter Richard begin to plead with Suzanne to return to the ranch and give their relationship another chance. She ultimately agreed, and in August 2002 Suzanne quit her teaching job, sold her New Mexico property (with Richard's assistance), and moved back to Colorado to be with him. Approximately two months later she moved her mother, who was suffering from the early stages of Alzheimer's Disease, from Houston to Dolores so that she could look after her.

However, Suzanne's decisions to sell her New Mexico property, return to Richard, and bring her mother up from Houston were not unconditional. This time, not knowing how the relationship would work out, Suzanne insisted the Richard provide some assurance of financial security for her. Suzanne hired a local lawyer who in February 2003 drafted three documents for them: (1) a quitclaim deed, in which Richard quitclaimed his anticipated interest in the Ranch to himself and Suzanne as joint tenants, Plaintiffs' Exhibit 8; (2) a "Premarital Agreement" that described what would be done with the Ranch and other property whether they remarried or cohabited, Plaintiffs' Exhibit 4; and (3) the "Lee/Hurd Horse Partnership Agreement" that set forth the terms of their horse breeding business, Plaintiffs' Exhibit 5 (also part of Plaintiffs' Exhibit 4).

February 2003 was also notable for the parties' discovery that Suzanne was pregnant. It is not clear whether the parties both were aware of the pregnancy when Suzanne's lawyer drafted the three documents. But they indisputably did know it by April 7, 2003 when they signed the documents before a notary. The documents were recorded in the Montezuma County records on or about April 18, 2003. Their daughter TaraRose was born in September 2003.

The parties' reconciliation ultimately failed, due in part to Richard's infidelity, and Suzanne left Richard on an unknown date in late 2005 or early 2006. There was some initial discussion of parenting time for Richard, but he abandoned his claim and questioned whether he was in fact TaraRose's father.[1] TaraRose thereafter lived exclusively with Suzanne. Suzanne quitclaimed her interest in the Ranch to a revocable trust for the benefit of TaraRose. Charles Hurd deeded the Ranch to Richard in 2013. In July 2014 Suzanne, as trustee of the revocable TaraRose trust, quitclaimed the trust's interest in the Ranch to an irrevocable trust for the benefit of TaraRose. Plaintiffs' Exhibit 9.

However, Richard denied that the quitclaim deed by which he conveyed his interest in the Ranch to himself and Suzanne in joint tenancy was enforceable. By then Suzanne and TaraRose were residing in Missouri, and Richard was either residing in Alaska or was in transition between Colorado and Alaska. Invoking diversity of citizenship jurisdiction, Suzanne individually and on behalf of the irrevocable trust filed this suit against Richard on July 20, 2021. ECF No. 1. She sought an order of partition, specifically that the Ranch including associated water rights be sold with the net proceeds to be divided between Richard and Suzanne, as well as a money judgment

---

[1] His paternity was confirmed by a paternity test obtained by TaraRose in 2022. *See* Plaintiffs' Exhibit 22.

3

equal to the value of all benefits Richard had received during their period of joint ownership, plus interest and costs. *Id.* at 6.

When TaraRose reached adulthood in September 2021 Suzanne caused the irrevocable trust to quitclaim its interest in the Ranch to TaraRose. *See* Plaintiffs' Exhibit 10. She then filed an Amended Complaint naming herself individually and in her capacity as trustee of the TaraRose Lee 2009 Irrevocable Trust, and TaraRose Lee individually, as plaintiffs. ECF No. 16. In the Amended Complaint plaintiffs sought an order quieting title in the Ranch in Richard and the plaintiffs; partitioning, selling, and dividing the net proceeds equally; a money judgment for and amount to be determined plus costs, interest, and attorney's fees; and a money judgment in favor of TaraRose or Suzanne for unpaid child support. *Id.* at 13.

Richrd moved to dismiss the Amended Complaint and all claims therein. ECF No. 22. The Court denied the motion except for the child support claims as to which it lacked jurisdiction. ECF No. 29. The case was tried to the Court on July 10, 11 and 13, 2023.

## CONCLUSIONS INCLUDING ADDITONAL FINDINGS

This case poses the following questions: (1) did Richard's quitclaim deed convey an enforceable interest in the Ranch to Suzanne? (2) if the quitclaim deed by itself did not convey an interest, did the Premarital Agreement and the quitclaim deed together do so? (3) was there a breach of the Lee/Hurd Horse Partnership agreement? (4) if the answer to questions one, two and/or three is "yes," what remedy is appropriate? (5) are plaintiffs entitled to an award of attorney's fees based on their claim that the defense, in whole or in part, lacked substantial justification?

### A. The Quitclaim Deed.

In its order granting in part and denying in part Richard's motion to dismiss, the Court discussed the enforceability of the quitclaim deed by which he transferred his future interest in the Ranch to himself and Suzanne in joint tenancy. *See* ECF No. 29. Rather than repeating that extended discussion, I will quote here the key conclusions:

> Ms. Lee received her alleged interest via the 2003 quitclaim deed. The most common deed is a warranty deed, which purports to convey property by warranting that the grantor has legal title in the property conveyed. Quitclaim deeds are different. They purport to convey not a property itself but only a grantor's interest — if any — in the property. *See* 2 Colo. Prac., Methods of Prac. § 64:2. Types of Deeds (7th ed.). As a general rule, "a quitclaim deed . . . is ineffectual to pass to the grantee any title or right acquired by the grantor subsequent to execution." *Tuttle v. Burrows*, 852 P.2d 1314, 1316 (Colo. App. 1992) (emphasis omitted).
>
> If the 2003 quitclaim deed were the only basis for plaintiffs' claim, that would be the end of the matter because quitclaim deeds make no warranty of title. But Colorado's common law after-acquired interest doctrine applies in another situation as well. The doctrine will convey after-acquired property interests both in cases of implied warranty, and also where the intent to convey after-acquired interests is found in "an express covenant in a contract or instrument of conveyance." *Amada*, 2021 COA at ¶ 37, 494 P.3d at 643. In *Amada*, the court found a quitclaim deed sufficient to convey after-acquired property because the deed "expressly promise[d] the transfer of an after-acquired [interest]." *Id.* at ¶ 38. *Here, plaintiffs allege that the premarital agreement, a contract executed contemporaneously with the 2003 quitclaim deed, acknowledged that Richard did not yet own the property but expressly promised Suzanne an interest when Charles conveyed the property to Richard. ECF No. 16 at ¶ 63. This "express covenant in a contract" brings a quitclaim deed within the common law after-acquired interest doctrine. Amada, 494 P.3d at 643. If Ms. Lee can point to a contract that expressly promised her one half of Richard's after-acquired interest, she will be entitled to the relief she seeks.*

*Id.* at 9-10 (emphasis added).

5

Therefore, the primary issue for trial was whether the "premarital agreement" expressly promised Suzanne half of Richard's after-acquired interest in the Ranch. I turn to that issue next.[2]

### B. The Premarital Agreement.

Although labeled the "Premarital Agreement," the document relates in its "WHEREAS" clauses that the parties (Richard and Suzanne) "desire to enter into this agreement prior to their contemplated marriage or cohabitation," and that "the parties are about to cohabitate or contract marriage and execute this agreement in contemplation of marriage or cohabitation to be effective upon their marriage or cohabitation in accordance with the laws of Colorado." Plaintiffs' Exhibit 4 at 1. The parties did not remarry. Suzanne testified that they cohabited for approximately three years following her return to Colorado. In the first place, Richard disputes the authenticity of the Premarital Agreement; but if it is authentic, he disputes that they cohabited the Ranch; and if they cohabited, he disputes that the agreement amounted to an express promise to convey his after-acquired interest in the Ranch to Suzanne.

1. Authenticity.

Richard denied that he signed the Premarital Agreement. When confronted with the notarized signature page bearing his signature, he suggested that he was only given a two or three page document to sign, and that the signature page must have been attached to that

---

[2] As I have noted, there were three other quitclaims deeds in the relevant history of the case: Suzanne's quitclaim of her interest in the Ranch to the revocable trust on behalf of TaraRose; Suzanne's causing the revocable trust to quitclaim its interest in the Ranch to the irrevocable trust on behalf of TaraRose; and finally her causing that trust to quitclaim its interest in the Ranch to TaraRose individually. Richard disputes the validity of his quitclaim to Suzanne. He has not, however, challenged her quitclaim of her alleged interest to the revocable trust, its quitclaim of that interest to the irrevocable trust, and ultimately its quitclaim of its interest, if any, to TaraRose.

document. He could not produce the alleged shorter document, only a signature page with the lower half redacted. Defendant's Exhibit 3. However, when an unredacted copy of his tendered signature page was obtained from documents he provided to counsel, it was paginated page 8, identical to page 8 of Plaintiff's Exhibit 4. The authenticity objection essentially disappeared at that point. The Court found that Plaintiffs' Exhibit 4 was authentic and admitted the exhibit.[3]

   2. Cohabitation.

Richard denied that the parties cohabited the Ranch, asserting that Suzanne never spent even one night at the Ranch between her return to Colorado in August 2002 and her ultimate decision to leave again in late 2005 or early 2006. When Suzanne presented a series of photographs showing her, Richard, and their infant/toddler child TaraRose together in the Ranch house and on the Ranch grounds, Plaintiffs' Exhibit 15, Richard denied that the indoor photos were of the Ranch house. He denied that the furniture, window coverings, carpeting, etc. shown in the photos were in his house.

Suzanne had rented a small apartment in Dolores for her mother when she brought her mother up from Texas in approximately November 2002. Suzanne then used the proceeds from

---

[3] Another authenticity challenge asserted by Richard was that the recorded copy of this document is missing its exhibits A, B and E. Exhibit E was a copy of the quitclaim deed, recorded separately on the same day. Suzanne described exhibits A and B as the parties' respective disclosures of their assets, and she explained that the parties did not wish to place their financial disclosures in the public record when they recorded the Premarital Agreement. Neither party produced copies of these financial disclosures during discovery or at trial. A "marital agreement" was not enforceable at the time unless the party against whom enforcement was sought was provided a fair and reasonable disclosure of the property of the other party. *See* Colo. Rev. Stat. § 14-2-307(1)(b) (2003). The parties' disclosures in exhibits A and B were presumably intended to comply with the law in the event that they remarried. In any event, Richard has never claimed that he was not provided fair and reasonable disclosure of Suzanne's assets. The Court concludes that the absence of these three exhibits in the recorded Premarital Agreement, a copy of which was admitted as Plaintiffs' Exhibit 4, does not undermine the authenticity of the exhibit.

the sale of her New Mexico property to buy land in Mancos, Colorado and had a small "cabin" built on the property for her mother. The cabin was between five and seven miles from the Ranch house. Richard insisted that the photographs purporting to show the parties together in the Ranch house were actually taken at the Mancos cabin, where he claimed Suzanne was living with her mother. Suzanne acknowledged that she sometimes spent nights with her mother, more so as her Alzheimer's Disease worsened, but she testified that she spent most of the nights during the three-year reconciliation period with Richard at the Ranch.

Richard's son Eric Hurd, testifying remotely by video teleconference from Alaska, backed Richard's testimony 100%. Eric primarily lived with his mother (Richard's first wife), but he spent time in the Ranch house during weekends, summers, and some holidays. He testified that the photos were not of the Ranch house, and he that he did not see Suzanne there.

In further support, the called Richard's sister, Bonita Hackler, as a witness by video teleconference from her home in Georgia. She testified that she visited the Ranch two or three times a year between 2002 and 2013, usually staying one or two weeks, but at least once staying a whole month. Although she had met Suzanne in New Mexico, even before Richard and Suzanne married, she never saw her when she visited the Ranch. She also never saw TaraRose there. She was shown some of the photos and agreed that they did not match the couch or the flooring at the Ranch house.

The Richard, Eric and Bonita story began to unravel during her cross-examination. Plaintiffs' counsel asked Ms. Hackler to confirm that she had told him on the telephone the preceding Tuesday that she did not know whether Suzanne had lived with Richard at the Ranch because she hadn't been there. She denied telling him that. Counsel pointed out that TaraRose

8

listened to the call and could confirm what Ms. Hackler had said. Ms. Hackler responded that she had recorded the call. But when counsel asked her to play the recording, she claimed it was on another phone, and that the phone's battery had died. At counsel's request, the Court asked Ms. Hackler if she could obtain a battery and then play the recording. It was at that point that Ms. Hackler admitted that there was no recording, and that she had lied under oath about it.

The Court gave Ms. Hackler and the parties a stern reminder of the importance of the oath and the potential consequences of perjury. Ms. Hackler then acknowledged that on June 20, 2023 she had "unsent" all her communications with Tara, including one that offered that she had information that might help plaintiff's case. She testified that Suzanne did "sporadically" and "occasionally" stay at the Ranch, for maybe a day, a week, or a month, but then would leave, so she did not "continuously" live there.

Mr. Hurd planned to call his other daughter, Celeste, who had spent more time at the Ranch than Eric, to support his story that Suzanne was never there. However, initially there were some technical difficulties, and after the Hackler testimony, Celeste was not called.

Plaintiff then produced for impeachment purposes more photographs, and a Zillow description of the Ranch house at a time when he had attempted to sell the Ranch. Plaintiffs' Exhibits 47-50. These documents established beyond any doubt that the furniture shown in the photographs claimed by Richard not to be at his house were, in fact, his furniture in his house. Defense counsel acknowledged surprise and admitted that his client had credibility issues.

The parties expressly contemplated living together, either as cohabitants or as a married couple. They reached an agreement as to how their properties would be treated. They had an intimate relationship, and they bore and began to raise a child together. Shortly before their

9

"Premarital Agreement" the Colorado Supreme Court "join[ed] the majority of courts in other states in holding that nonmarried cohabitating couples may legally contract with each other so long as sexual relations are merely incidental to the agreement. Furthermore, such couples may ask a court for assistance, in law or in equity, to enforce such agreements." *Salzman v. Bacharach,* 996 P.2d 1263, 1267 (Colo. 2000). The *Salzman* court continued,

> The frequency of nonmarital cohabitation has substantially increased since the 1940s. *See* Bureau of the Census, *Marital Status and Living Arrangements: March 1993,* VII–VIII, tbl.D (May 1994) (indicating that from 1970 to 1993 alone, the number of unmarried-couple households in the U.S. increased 571%, from 523,000 to 3,510,000). As a result, courts throughout the country now face with increasing regularity the controversies arising out of the breakup of these relationships. Litigants have asked courts to establish the appropriate balance between the public policy favoring marriage, old cases explicitly disapproving any intimate contact outside of marriage, and accepted modern mores. The majority of courts have held in favor of the ability of nonmarried couples to contract with one another and to enforce those contracts in court.

*Id.*

The Court finds that Richard's testimony concerning where Suzanne lived between August 2002 and late 2005 or early 2006 was not credible. His testimony about the location of the interior house photos in Plaintiffs' Exhibit 15 was not credible. Eric Hurd's testimony was not credible. Bonita Hacklers' testimony for the most part was not credible. On the contrary, Suzanne's testimony that she spent the majority of the nights during this three year period with Richard at the Ranch was credible. Even on the nights when Suzanne stayed at her mother's house due to her deteriorating medical condition they were within about five miles of each other. Indeed, Richard admitted that he too spent time in the cabin and had intimate relations with Suzanne there. The Court finds that the parties cohabited during this period, and importantly,

that their "Premarital Agreement" spelled out the terms that they intended to abide by even if their cohabitation did not end in remarriage.

      3.  <u>Effect of the Premarital Agreement</u>.

The key relevant terms of the Premarital Agreement are found in paragraphs (4) on page 4 and paragraph (8) on page 5:

> (4) The party of the first part [Suzanne] shall either execute a will or make any required modifications of her existing living trust to assure that any personal or real property acquired as a result of inheritance or by deed associated with this agreement shall, upon the death of the party of the second part [Richard] be equally divided between the children of the party of the second part living at the time [of] the execution of this agreement and any children subsequently born to the union of the parties hereto or legally adopted by the parties during the existence of this agreement.
> . . .
> (8) During the course of the marriage or cohabitation, all property acquired by each party in their own name shall be deemed to be joint property and shall be deemed to be part of their joint estates and thereby evidence their intent to grant the powers and rights to the parties as to said jointly owned property as is provided to spouses by operation of law.  *This provision shall include the farm property in Montezuma County, Colorado, presently titled in the name of Charles Hurd, the father of the Party of the Second Part which is an expected legacy to the Party of the Second Part.  In furtherance of said expectation, the Party of the Second Part shall contemporaneously with the execution of this agreement execute a quit claim deed to said farm in favor of the parties as joint tenants.*

Plaintiffs' Exhibit 4 (emphasis added).

The Court interprets the contract as a matter of law.  Paragraph (8), quoted above, confirms the parties' intent that Richard's interest in the Ranch (described in the document as the Montezuma County, Colorado property), as an "expected legacy" from his father, was a subject of the agreement and would be conveyed by quitclaim deed to Richard and Suzanne as joint tenants.  The Court finds that this was an "express covenant in a contract" that brought the

11

quitclaim deed within the common law after-acquired interest doctrine under *Amada*, 494 P.3d at 643.

The significance of paragraph (4) was debated at trial. Suzanne did initially execute a will, as specified, but modified the will after Richard disputed the enforceability of the quitclaim deed. In this lawsuit Suzanne is attempting to honor her agreement that the ownership of the Ranch would ultimately go to Richard's children by his previous marriage (Eric and Celeste) and to the child born to the union of Richard and Suzanne (TaraRose).

The more significant issue here is the requirement that the property be "equally divided between the children of the party of the second part living at the time of execution of this agreement and any children subsequently born to the union of the parties hereto or legally adopted by the parties during the existence of this agreement." Suzanne argues that this means that Eric and Celeste are in line to inherit Richard's half of the Ranch (meaning whatever is left of his half of the proceeds of the sale of the Ranch when he passes), and that TaraRose will receive the other 50%, i.e., she receives what was Suzanne's half. Richard's position has been that because the quitclaim deed and cohabitation agreement are unenforceable, he owns 100% of the Ranch. However, perhaps reading the handwriting on the wall as the trial progressed, Richard responded to a question from the Court that he should receive 100% of the proceeds of the sale of the Ranch, but at the time of his passing, whatever is left should be divided in equal thirds among Eric, Celeste and TaraRose.

The Court's interpretation of the document is in accord with Suzanne's position. The plain language of the document is that Suzanne was to provide by will that the Ranch would be divided "between" Richard's children and any child or children of their union. It did not say

12

"among" the children. But if the wording of the document were construed to be ambiguous, then the Court's obligation would be to attempt to determine the parties' intent, and failing that, to apply standard rules of contract interpretation such as the rule that an ambiguous phrase will be construed against its draftsman (here a lawyer retained by Suzanne). Here, Suzanne has indicated that the intent of the parties was that Richard's half ultimately would go to his previous children, and that Suzanne's half would go to any child or children of Richard and Suzanne. That makes sense. Moreover, Richard did not offer any contrary evidence of the parties' intent. Rather, he disputed the authenticity of this document and claimed not to have signed it, a claim debunked by the document itself and other evidence in the case. The parties were not necessarily contemplating a sale of the Ranch. But the Court infers that the parties' intent was the Ranch, or as the proceeds of the sale of the Ranch, would be divided between Richard (and ultimately his children by his former marriage), on the one hand, and any children that might result from the cohabitation or remarriage of Richard and Suzanne, on the other hand.

### C. The Lee/Hurd Horse Partnership.

At the time of execution of the Lee/Hurd Horse Partnership, which was contemporaneous with the Quitclaim Deed and the Premarital Agreement, Richard the parties owned horses. In Exhibits C and D to the Premarital Agreement provided that, upon dissolution, Richard would own the horse Sugar; Suzanne would own the horses Magic (spelled the normal way in Exhibit C to the Premarital Agreement but Majic elsewhere) and Bandit; that that other horses would be jointly owned. The Lee/Hurd Partnership Agreement provided the same. Plaintiffs' Exhibit 5 at 1.

During the three years of the parties' cohabitation, Richard was buying, selling, breeding, and overseeing an average of about nine or ten horses at the Ranch. According to him, he had to bear all the time and expense involved in the horse business. According to Suzanne, Richard excluded her from the horse operations, and she was not proud of herself for letting him do it. Regardless, it wasn't operated as a partnership in fact. Richard did not account for the expenses, profits, or losses; and Suzanne did not and still does not know whether any money was made.

When Suzanne left Richard for good she claims that Richard refused even to let her take Majic. Richard responds that he would have been happy to let her take Majic, but she didn't have a trailer or other means to care for the horse. In the years that followed Richard continued to buy, sell, and breed horses; Suzanne also bought and sold horses; but neither of them provided any accounting or information to the other about their horse dealings, despite the fact that the formal partnership was never terminated. Richard called an expert in the valuation and reproductive cycle of horses, Nicole Tolle. However, although she provided general information about Tennessee Walking Horses, their value at various ages, their breeding season and other background information, she was not asked to provide any opinion as to the value of Sugar, Majic, Bandit or any jointly owned horse at any time during the parties' cohabitation or otherwise.

The Court finds that neither party produced any reliable information about the profits or losses of the horse partnership. If anything, the evidence tended to show that the horse business was not profitable. Neither party produced reliable information about the values of the specific horses they owned either individually or jointly. The Court concludes that plaintiffs did not prove their claim concerning the horse partnership to a preponderance of the evidence.

### D. Remedy.

The parties do not dispute that the Ranch should be sold. Richard tried to sell the Ranch on his own but was blocked by plaintiffs' notice of lis pendens. He is living in Alaska and temporarily residing with his son Eric. But he describes that as a temporary arrangement, and he testified that he needs money now to establish his own residence in Alaska and qualify for a resident hunting license. Tara, age 19, undoubtedly could use money now to finance higher education and to further pursue her goals as a championship archer.

The Court orders that Richard and TaraRose Lee, as joint owners, list the Ranch with a reputable real estate agent with experience in buying and selling rural properties in Montezuma County. Both parties must agree on the price and terms of sale. Despite their unfortunate estrangement, they should have a common goal of maximizing the proceeds. The net proceeds, after sales costs, will be divided equally between Richard and TaraRose Lee. If the parties cannot cooperate with regard to the listing and sale of the property, the Court will appoint a receiver to liquidate the property for them. That would be an expense that they should be able to avoid.

The Court awards no damages to the plaintiffs with respect to the Lee/Hurd Horse Partnership or plaintiffs' prayer for money damages resulting from Richard's exclusive use of the property since Suzanne left. Those claims were not proven.

### E. Attorney's Fees.

In their Amended Complaint plaintiffs expressly requested an award of attorneys in connection with the horse partnership claim and the child support claim. *See* ECF No. 16 at 12, ¶¶ 116, 121, and 125; 13 at ¶¶ c and d. However, plaintiffs did not establish those claims.

The Amended Complaint contains no express request or demand for an award of attorney's fees with respect to the quiet title or partition claims as to which plaintiff TaraRose Lee did prevail unless one were to interpret plaintiffs' broad demand for "all costs incurred in these proceedings" to impliedly include attorney's fees. *See id.* at 13, ¶b.

However, during closing arguments plaintiffs' counsel requested an award of attorney's fees under Colo. Rev. Stat. § 13-17-102. That statute provides, in part:

> (2) …in any civil action of any nature commenced or appealed in any court of record in this state, the court shall award, by way of judgment or separate order, reasonable attorney fees against any attorney or party who has brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification.
>
> (4) The court shall assess attorney fees if, upon the motion of any party or the court itself, it finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification …or that an attorney or party unnecessarily expanded the proceeding by improper conduct ….. As used in this article, "lacked substantial justification" means substantially frivolous, substantially groundless, or substantially vexatious.

The Court would not find the entire defense of this case to be substantially frivolous or groundless. It was reasonable to move to dismiss based on the after-acquired-interest statute, even though the motion was denied. It was reasonable to argue that the Premarital Agreement, in particular paragraph 4, supported an ultimate partition of the property different from fifty-fifty, even though the Court disagreed with defendant's argument.

However, it was unreasonable to the point of being groundless and vexatious to argue that the Premarital Agreement was not authentic because Richard only was presented with and signed a two- or three-page document; and that Richard and Suzanne did not cohabit between approximately August 2002 and approximately late in 2005; and that the photos showing the parties together in a house were not take at the Ranch house. The testimony that supported those

16

arguments was palpably false. The arguments of counsel based on that testimony were either known to be groundless (at one point Court staff observed counsel giving what appeared to be a "thumbs up" signal during the false testimony of Eric Hurd) or based on an entirely inadequate investigation of the client's story. As such, the testimony and arguments not only unreasonably expanded the plaintiffs' litigation costs but were unprofessional and disrespectful of the Court and the civil justice system.

The Court does not wish to impose fees or other sanctions without giving the parties and counsel an opportunity to brief the law and to be heard in court if desired. Accordingly, the Court invites the plaintiffs to submit an appropriate motion no later than September 1, 2023. Defendant and defense counsel, separately if necessary, may respond no later than September 22, 2023. Plaintiffs may reply no later than September 29, 2023. The parties should consider the potential application of Colo. Rev. Stat. § 13-17-102; Rule 11 of the Federal Rules of Civil Procedure; 28 U.S.C. § 1927; and such points and authorities as they deem appropriate.

**ORDER**

Judgment will enter in favor of the plaintiff TaraRose Lee (the present owner of Suzanne Lee's former interest) and against the defendant Richard Hurd. The Court quiets title of the Montezuma County property referred to as "the Ranch" or "the Farm" that is the primary subject of this case, including all water rights associated with the property, in Richard Hurd and TaraRose Lee jointly. The property is to be partitioned by the sale of the property and division of the net proceeds equally between Richard Hurd and TaraRose Lee. The parties are directed to proceed with the sale of the Ranch as promptly as reasonably possible. As the prevailing party

TaraRose Lee is awarded plaintiffs' reasonable costs to be taxed by the Clerk pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 18th day of August, 2023.

BY THE COURT:

_____

R. Brooke Jackson
Senior United States District Judge